**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR15-4091-LTS |
| vs. | **REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |
| VICTOR HUGO MALDONADO, | |
| Defendant. | |

## *I.   INTRODUCTION*

Defendant Victor Hugo Maldonado is charged by indictment with one count of being a felon and unlawful drug user in possession of a firearm. Doc. 2. The charge arose from a traffic stop on October 7, 2015, during which he was found in possession of a handgun after leaving a house where, the day before, a female had traded a handgun for methamphetamine. Defendant filed a motion to suppress evidence seized as a result of the traffic stop, as well as his incriminating statements made after his arrest. Doc. 18. The government resists, arguing probable cause existed to stop defendant's vehicle because defendant did not use a turn signal.[1] Doc. 28. The Trial Management Order (Doc. 7 at 2) assigns motions to suppress to a United States Magistrate Judge to conduct any necessary evidentiary hearings and to prepare reports on, and recommend dispositions of, those motions.

---

[1] In its brief, the government offered possible alternative theories of reasonable suspicion and inevitable discovery. Doc. 18-1, at 5 n.1. The government has since indicated that it withdraws those alternative arguments.

I held an evidentiary hearing on defendant's motion on April 18, 2016. The government called seven witnesses, and I admitted Exhibit 5[2] (a dashboard video from Deputy Milton's vehicle), Exhibit 7 (an aerial map of the area of the traffic stop), Exhibit 8 (an audio recording from Deputy Milton's body microphone), and Exhibit C (still photographs of the intersection of South John Street and West 2nd Street). The motion is fully submitted. For the reasons set forth below, I recommend the court deny defendant's motion to suppress.

## II. SUMMARY OF EVIDENCE

In the afternoon or evening of October 6, 2015, Woodbury County Sheriff's deputies responded to a call by a man claiming a female was stealing his car. It turned out, instead, that the female and male were in a dispute over the cost of methamphetamine she was trying to sell him. Officers found methamphetamine in her car. She cooperated with authorities and told Officer Carl Ragar that she had traded a handgun for the methamphetamine. She identified the house where she purchased the methamphetamine, which was located at 1901 West Highland Avenue, Sioux City (the house). West Highland Avenue is an east/west road. The house sits on the corner of West Highland Avenue and South Helmer Street, which runs north/south. *See* Exhibit 7 (aerial map).

On the morning of October 7, 2015, members of the Drug Enforcement Administration (DEA) Task Force, with the assistance of Woodbury County Deputies, set up surveillance on the house while officers applied for a search warrant. The officers (Cindy Martinez, Mike Koehler, and Special Agent David Jensen) all testified that the intention was to stop any vehicle leaving the house, if probable cause existed for the stop,

---

[2] Defendant also marked, the court admitted, this video as Exhibit A.

while awaiting issuance of the search warrant. In other words, the surveillance officers intended to watch for traffic violations or other violations of law that would provide probable cause to stop vehicles associated with the house. If they observed such violations, they intended to radio deputies to execute a traffic stop on any such vehicles.

Officers Martinez and Koehler, and Special Agent Jensen, testified that sometime after 8:00 a.m., a black SUV left the house. Officers Martinez and Koehler followed the vehicle intending to stop it, but they did not observe any traffic violations before the vehicle pulled into a residence on Blair Street. The officers did not conduct further surveillance on that vehicle, but returned to the house. At some point, officer Martinez saw that same vehicle, or one matching its description, again parked in the driveway at the house (although no officer saw it arrive). The vehicle had been at the house for more than an hour when officer Martinez and Special Agent Jensen saw a man and two females leave the house and enter the vehicle. The vehicle proceeded south on South Helmer Street, stopped at the intersection, and turned west on West Highland Avenue.

Special Agent Jensen was located approximately a block south of the intersection of West Highland Avenue and South Helmer Street, using binoculars to watch activity at the house. He was focused on the occupants through the windshield of the vehicle. So, although he could tell the vehicle came to a stop at the intersection, his vision was too magnified to see the rest of the vehicle. Therefore, he did not know whether the driver used a turn signal at the intersection.

Officer Martinez was in an unmarked vehicle parked on the side of South Helmer Street, approximately a quarter of a block south of the intersection with West Highland Avenue. She observed the vehicle leave the residence heading south on South Helmer Street, then turn right, heading west on West Highland Avenue. Another vehicle blocked her view of the intersection, so she, too, was unable to see whether the driver used a turn signal before turning.

3

Officer Martinez pulled out of her parked position and turned onto West Highland Avenue, heading west behind the vehicle. When she approached the next street, South Turner Street, she noticed another unmarked police vehicle driven by Officer Koehler pulled in behind the suspect vehicle. Officer Martinez, therefore, turned south on South Turner Street, paused just past the corner, and watched the suspect vehicle and Officer Koehler as they approached the next intersection with South John Street. Officer Martinez testified there was one to two car lengths between the suspect vehicle and Officer Koehler's vehicle. Officer Martinez testified she was able to see both rear taillights of the suspect vehicle as it approached the intersection with South John Street. She testified the suspect vehicle did not use its right turn signal. She testified that she was about to call out the violation on the radio when she heard Officer Koehler or some other officer do so. Officer Martinez testified she had no doubt in her mind that the suspect vehicle did not signal a right-hand turn.

Officer Koehler testified that he was originally parked facing north on South Turner Street, just south of the intersection with West Highland Avenue, when he heard radio traffic that a black vehicle left the house and was headed west on West Highland Avenue. He saw the suspect vehicle pass him headed west on West Highland Avenue. Officer Koehler pulled out behind the vehicle and followed him. Originally, he was a few car lengths behind the suspect vehicle, but as they approached the intersection with South John Street, Officer Koehler was one to one and a half car lengths (30-40 feet) behind the suspect vehicle. Officer Koehler testified that the vehicle came to a stop at South John Street, but when it turned right, it did not use its turn signal. Officer Koehler called out the traffic violation on the radio as he turned and followed the suspect vehicle heading north on South John Street. When Officer Koehler became aware a deputy sheriff had visual contact with the suspect vehicle, Officer Koehler turned west on West First Street so that a marked unit could get behind the suspect vehicle. He called out on

4

the radio to "light him up," meaning to stop the suspect vehicle. Officer Koehler testified he had no doubt in his mind that the suspect vehicle did not use a turn signal when turning north onto South John Street.

Deputy Milton had been parked facing west on West 2nd Street, near its intersection with South John Street, when he heard radio traffic describing the suspect vehicle. Deputy Milton testified that he heard one of the officers radio that the vehicle had turned without using a turn signal. Deputy Milton saw the suspect vehicle on his left as it approached the intersection of South John Street and West 2nd Street. Deputy Milton testified that he radioed to confirm the traffic violation in order to make sure he had probable cause to stop the vehicle. When "they said yes," Deputy Milton radioed that he would attempt to stop the vehicle. Deputy Milton testified (and Exhibit 5 shows) the suspect vehicle approached the intersection with West 2nd Street. The vehicle pulled a little way into the intersection before coming to a brief stop, then turned left, heading west on West 2nd Street. Deputy Milton testified that the vehicle probably committed a traffic violation in the manner it entered the intersection and turned, but he did not charge the driver with that traffic offense, nor did he rely on that conduct to stop the vehicle.

Deputy Milton activated his emergency lights to stop the suspect vehicle. When the deputy activated his lights, it started the dashboard video recording. The video automatically captured about 30 seconds of video immediately preceding activation of the lights. The video recording (Exhibit 5) captured the point in time from when the suspect vehicle entered the intersection with West 2nd Street through the defendant's arrest. It did not capture the radio traffic announcing the traffic violation or Deputy Milton's confirmation of the violation.

The rest of the incident is reflected in the video recording. In summary, however, the suspect vehicle did not come to an immediate stop after Deputy Milton

activated his emergency lights. Rather, the vehicle continued west on West 2nd Street for a block, came to a momentary stop at the intersection with Collins Street and, using a turn signal, proceeded north on Collins Street for a half block before Deputy Nick Sands, coming south on Collins, blocked the vehicle. The deputies arrested plaintiff at gun point. Officers searched the vehicle and found the handgun which is the subject of the criminal charge. Defendant later made incriminating statements regarding the handgun.

When the suspect vehicle left the house and was followed by the other officers, Deputy Sands had been parked facing east on West 3rd Street, just west of the intersection with Collins Street. He was, therefore, approximately six blocks from the house. Deputy Sands heard radio traffic about a vehicle committing a traffic violation, that Deputy Milton was behind the vehicle, that the vehicle was not stopping, and that the vehicle was heading north on Collins Street. Deputy Sands turned south on Collins where he blocked the suspect vehicle. Deputy Sands did not see the suspect vehicle until he drove south on Collins Street to stop it. A day or two after this incident, Deputy Sands dictated a report. In the report, Deputy Sands stated that the traffic violation forming the basis for the traffic stop occurred when the vehicle rolled through the stop sign at the corner of South John Street and West 2nd Street. At the suppression hearing, Deputy Sands testified he was sure he heard on the radio that the vehicle made a traffic violation, and he thought the violation was rolling through the stop sign, he tries to be accurate in his reports, but he acknowledged he may have made a mistake.

### III. DISCUSSION

"[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable . . . ." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995) (internal quotation omitted). A traffic stop constitutes a seizure under the Fourth Amendment.

*Whren v. United States*, 517 U.S. 806, 809-10 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). A traffic stop is reasonable "when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion" that a traffic violation has occurred. *United States v. Gordon*, 741 F.3d 872, 876 (8th Cir. 2013) (internal quotation omitted). *See also United States v. Mendoza*, 677 F.3d 822, 827 (8th Cir. 2012) ("The Fourth Amendment's prohibition against unreasonable searches and seizures requires that an investigatory traffic stop 'be supported by at least a reasonable, articulable suspicion that criminal activity is afoot.'" (quoting *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001)); *United States v. Randolph*, 628 F.3d 1022, 1024 (8th Cir. 2011) ("The decision to stop the driver is reasonable if the officer has probable cause to believe a traffic violation occurred.").

"A traffic violation, however minor, provides probable cause sufficient to satisfy the constitutional reasonableness requirement." *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011). *See also United States v. Adler*, 590 F.3d 581, 583 (8th Cir. 2009) ("Any traffic violation, however minor, provides probable cause for a traffic stop." (quoting *United States v. Wright*, 512 F. 3d 466, 471 (8th Cir. 2008)). Iowa Code, Section 321.314, provides:

> No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety and then only after giving a clearly audible signal by sounding the horn if any pedestrian may be affected by such movement or after giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by such movement.

Making a turn without using a turn signal, therefore, provides probable cause to stop the vehicle. *See*, *e.g.*, *Mendoza*, 677 F.3d at 828 (finding officer had probable cause to

7

stop the defendant when, among other traffic violations, he violated the Iowa Code by failing to signal a turn); *Randolph*, 628 F.3d at 1025 (noting that the defendant did not dispute that his failure to signal a turn violated the Iowa Code and gave rise to probable cause); *Adler*, 590 F.3d at 582-85 (holding that police officers had probable cause to stop a driver who failed to use a turn signal); *United States v. Rodriguez-Lopez*, 444 F.3d 1020, 1021 (8th Cir. 2006) (holding that a driver's failure to properly signal a turn provided probable cause to stop the vehicle); *United States v. Cummins*, 920 F.2d 498, 499 (8th Cir. 1990) (holding that officer had probable cause to stop a vehicle for failing to use a turn signal).

In this case, I found Officers Martinez and Koehler credible when they testified they observed defendant turn north on South John Street without signaling, in violation of Iowa law. In addition to the officers' demeanor and manner of testifying that appeared credible to me, there is other circumstantial evidence supporting the credibility of their testimony. First, Officer Koehler called out on the radio the fact that defendant failed to use a turn signal. Deputy Milton heard the radio call, and confirmed it before he stopped defendant's vehicle. I found Deputy Milton's testimony credible. Second, were officers Martinez and Koehler fabricating a traffic violation, they had other, earlier opportunities to do so. They could have, for example, claimed defendant failed to signal a turn at the very first turn onto West Highland Avenue. The officers' testimony that they could not see whether defendant used a turn signal then lends credibility to their testimony. Indeed, the officers could have claimed defendant's car sped, or swerved in the road, or committed other driving offenses not easily disproven if they were simply fabricating evidence. The fact that they claim only to have seen a single traffic violation enhances their credibility. Third, Officers Koehler and Martinez indicated in their contemporaneous reports that defendant failed to signal a turn, and Deputy Milton's contemporaneous report reflected that radioed message. The officers wrote those

8

reports prior to defendant moving to suppress evidence, and, thus, prior to any obvious motive to fabricate a traffic violation. Fourth, none of the officers, agents, or deputies knew who was driving the car. In other words, this is not a case where the officers knew the driver, were specifically targeting the driver, and had a motive to stop the driver at any cost. Rather, the officers here had no idea who the driver was at the time of the stop.

The officers honestly acknowledged that they intended to try to stop any vehicle leaving the house if there was probable cause to stop the vehicle. The Supreme Court has made it clear that "the officer's actual state of mind at the time the challenged action was taken" is not significant in determining whether they violated the Fourth Amendment. *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985). Thus, "the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances." *United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005) (quoting *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005)). Therefore, the fact that the officers were motivated in stopping the car because of the connection with the house does not detract from the validity of the stop when, as here, the evidence shows defendant committed a traffic violation. It should be noted, however, that courts should take into account the fact the officers were looking for a reason to stop the car in assessing their credibility. Here, I took that motivation into account and am satisfied that the officers were testifying truthfully when they said they saw a traffic violation.

In reaching my credibility determination, I also took into account the absence of any recording of the radio call by Officer Koehler reporting defendant's traffic offense. Given the timing of that call, and Deputy Milton's contact with defendant's vehicle, however, it makes sense that the call was not captured on Deputy Milton's video recording. That recording captured 30 seconds prior to when he activated his emergency lights, which he did not do until defendant pulled through the intersection of

South John and West 2nd Streets.  Officers Koehler and Martinez, however, would not have likely known whether the video captured the call when they wrote their reports, which arguably enhances their credibility.

Finally, in making my credibility assessment, I, of course, took into account that Deputy Sands' report indicated that defendant rolling through a stop sign was the basis for the traffic stop.  This is inconsistent with the testimony of Officers Martinez and Koehler and Deputy Milton.  It is also inconsistent, to a degree, with the video from Deputy Milton's vehicle which shows defendant's vehicle coming to a brief stop before proceeding through the intersection of South John and West 2nd Streets.  In the end, however, I find Deputy Sands' report simply mistaken, a product of second-hand information.  Deputy Sands did not purport to witness any traffic violation; rather, he relied on information from others.  It would be a different matter, for example, had Officer Martinez or Officer Koehler written that defendant rolled through a traffic sign.  Then the witnesses' testimony would have been inconsistent with their own reports.  Further, Deputy Sands testified that he was confident he heard over the radio that the vehicle had committed a traffic violation, but was less confident he had it right when he wrote the violation was rolling through a stop sign.  Deputy Sands did not have the benefit of a recording of the radio call, and wrote his report a day or two after the event, relying on his recollection of events.  That he made this mistake is regrettable, but understandable human fallibility.  It does not detract from the firm testimony of Officers Martinez and Koehler that they saw defendant turn without signaling, as corroborated by Deputy Milton's testimony that he heard over the radio that defendant turned without signaling.

Therefore, I find that Deputy Milton had probable cause to stop defendant's vehicle for turning without signaling.  Defendant does not challenge Deputy Milton's ability to rely on information conveyed by another officer, nor could he.  *See Frasher*,

632 F.3d at 453 ("When multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of the arresting officers as long as there is some degree of communication."). In his written motion, defendant did not allege that officers violated his Fourth or Fifth Amendment rights after stopping his vehicle. At the hearing on this motion, defendant confirmed he is making no such allegations. In other words, the parties are in agreement that if the traffic stop was valid, the evidence that flowed from that stop is admissible. I find the traffic stop was valid, and that no evidence should be suppressed.

## IV.   CONCLUSION

For the foregoing reasons, I RESPECTFULLY RECOMMEND that defendant's motion to suppress (Doc. 18) be **denied**.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Crim. P. 59(b), and LCrR 59 must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Any response to the objections must be filed within 7 days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 20th day of April, 2016.

_____
C.J. Williams
United States Magistrate Judge
Northern District of Iowa